# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| REALTIME ADAPTIVE STREAMING, LLC<br>　　　Plaintiff,<br>v.<br>SLING TV L.L.C., et al.<br>　　　Defendants. | CIVIL ACTION NO. 1:17-CV-02097<br><br>PATENT CASE |

**DEFENDANTS' MOTION TO FIND THIS CASE EXCEPTIONAL
UNDER 35 U.S.C. § 285 AND FOR FEE SHIFTING OF ATTORNEYS' FEES**

## I.   INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 54(d)(2) and 35 U.S.C. § 285, Defendants—the prevailing parties—respectfully request this Court: (1) find this case to be exceptional; and (2) award Defendants their attorney fees incurred litigating this case after the stay was lifted, in the amount of $5,075,519.[1]

Throughout this case, Defendants steadfastly maintained that the asserted claims of the '610 patent are invalid for claiming ineligible subject matter. Realtime's refusal to re-evaluate its claims when Realtime knew or should have known of the eligibility problem with the '610 patent significantly increased Defendants' costs. Thus, this Court should find this case exceptional and order fee shifting, just like the Central District of California did in Realtime's case against Netflix.

## II.   FACTS AND TIMELINE

On December 6, 2017, Defendants moved to dismiss the amended complaint, Dkt. No. 32, for claims covering patent-ineligible subject matter. Dkt. 47 at 1. Specifically, Defendants argued, "Realtime's asserted patents claim the well-known and abstract concept of selecting a compression scheme based on characteristics of the data being compressed." *Id*. at 2. During the hearing, the

---

[1] Defendants provide a "fair estimate" of the amount sought. Rule 54(d)(2)(B)(iii). This motion is supported with affidavits (Exs. 1, 2), "a summary of relevant qualifications and experience" for each person for whom fees are claimed, "a detailed description of the services rendered, the amount of time spent, the hourly rate charged, and the total amount claimed." D.C.COLO.LCivR 54.3.

Court expressed doubts about the eligibility of the '610 patent:

> Maybe this is just an abstract concept. This doesn't sound like something you would patent. It doesn't sound like its technology. It just sounds like an idea.

Mar. 7, 2018 Hrg. Tr. at 9:9-14. At Realtime's urging, the Court chose to perform claim construction before deciding eligibility. *Id*. at 14:14-15 ("[W]e need to get these terms defined and then see where we are.") The Court construed claim terms, including the term "throughput of a communication channel," on January 11, 2019, Dkt. 151, and stayed the case shortly thereafter for *inter partes* review (which cannot decide § 101 issues). Dkts. 162, 167.

Concurrently, two other district courts held that Realtime's nearly identical claims from the '535 patent were unpatentable under § 101. *Realtime Adaptive Streaming, LLC* ("*RAS*") *v. Google, LLC*, No. 2:18-cv-03629, Dkt. 36 (C.D. Cal. Oct. 25, 2018); *RAS v. Netflix, Inc.*, No. 17-1692, Dkt. 48 (D. Del. Dec. 12, 2018) ("*Netflix*") (report & recommendation). In addition, the Federal Circuit also held that selecting a compression technique and converting data between formats are patent-ineligible abstract ideas. *Adaptive Streaming Inc. v. Netflix, Inc.*, 836 F. App'x 900, 901 (Fed. Cir. 2020).

At Realtime's urging, the Court lifted the stay on January 15, 2021. Dkt. 179. Shortly thereafter, Defendants wrote to Realtime's counsel to "place Realtime and its counsel on notice regarding the significant financial liability that Realtime and its counsel face [including under] 35 U.S.C. § 285, if Realtime continues to pursue this meritless litigation." Ex. 3 at 1. In the letter, Defendants highlighted the baselessness of asserting the '610 patent. *Id.* Defendants explained that in "both the District of Delaware and the Central District of California, numerous claims of the '535 patent—the parent patent to the '610 patent—were held patent ineligible under 35 U.S.C. § 101" and that "[e]ven a casual comparison of the '610 patent asserted claims to the now invalid

claims of the '535 patent reveals that the '610 asserted claims are likely to suffer the same ineligibility finding." *Id*. at 4.  Defendants also explained that the Federal Circuit's *Adaptive Streaming* opinion showed "there can be no objective basis for continuing to litigate [the '610 patent] against Defendants . . . ." *Id.*

Realtime brushed off Defendants' letter, seeking to justify its claims by mischaracterizing the record and case law.  Ex. 4.  Realtime stated that "DISH moved to dismiss under § 101 and the Court denied that motion.  Thus, you are threatening fees on an issue DISH lost on." *Id.* at 1.  In fact, as discussed above, the Court merely accepted Realtime's request to decide the issue after claim construction.  Realtime also claimed that "contrary to your false assertion—the Central District of California issued an order upholding the patent-eligibility of the related '535, '046, and '477 patents [which] strongly supports the validity of the '610 patent." *Id.* at 5.  But as Defendants wrote to Realtime, *see id.* at 4, and as the Court later agreed in its order granting summary judgment, Dkt. 305 at 11–12, Realtime's position was unsupported.

Realtime's response also dodged Defendants' warnings about the *Netflix* and *Adaptive Streaming* opinions, asserting that Defendants "resort to misdirection by pointing to wholly unrelated cases not involving patents/claims conceived by the Realtime inventors."  Ex. 4 at 6.  However, these cases strongly evidenced that the '610 patent was ineligible.  *See* Dkt. 305 at 4.

Realtime's blind pursuit of its claims—despite all indications they were baseless—forced Defendants to expend millions of dollars defending themselves from a case Realtime should have dropped before asking to lift the stay.  Following discovery, Defendants filed for summary judgment that the '610 patent was ineligible, relying on the same arguments Defendants informed Realtime about months earlier.  Dkt. 234.  The Court granted Defendants' motion, finding that "as

in the *Adaptive Streaming*, *Google*, and *Netflix* cases, . . . the plaintiff has not come forward with evidence that shows a genuine dispute about a fact that is material to the resolution of the case." Dkt. 305 at 14.  The Court explained that "Realtime focuses primarily on the term 'throughput of a communication channel' but that "[t]he absence of implementation details is evident on the face of the patent" and that Realtime did "not come forward with any evidence that raises a genuine dispute of material fact about whether consideration of the number of pending transmission requests was a new or inventive concept."  *Id*. at 10, 14.  The Court further recognized that several of Realtime's arguments were "conclusory" or "missing [] an explanation."  *Id*. at 12.

A timeline of events relevant to this motion is illustrated below:



### III.  LEGAL STANDARD

35 U.S.C. § 285 instructs that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  Courts determine if a case is exceptional on a case-by-case basis considering the totality of the circumstances.  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).  There is "no precise rule or formula for" determining whether a case is exceptional.  *Biax Corp. v. Nvidia Corp.*, 626 Fed. App'x 968, 970-71 (Fed. Cir.

2015) (citing *Octane Fitness*, 572 U.S. at 554).  Instead, an exceptional case is one that "stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated."  *Id.*  Post-*Octane Fitness*, courts routinely award attorneys' fees where the asserted patent clearly lacked subject matter eligibility.  *See Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*, 876 F.3d 1372, 1379 (Fed. Cir. 2017) (affirming fees where there was "no uncertainty or difficulty in applying the principles set out in *Alice* to reach the conclusion that the [] patent's claims are ineligible").

### IV.  ARGUMENT

Realtime's unreasonable litigation strategy, coupled with its exceptionally weak merits positions, make this case exceptional.  While Realtime's claims were always flawed, its claims became untenable before Realtime requested the stay be lifted.  Further, Realtime's litigation conduct needlessly prolonged and multiplied the proceedings at great expense to Defendants.  Defendants are the prevailing party, Dkt. 305 ("[a]s the prevailing party defendant is awarded . . . costs"), and Realtime's conduct leaves no doubt this case is exceptional.

#### A.  Realtime's Claims Were Exceptionally Weak

##### 1.  Realtime's Arguments Were Untenable In Light of the Cases Holding the Related '535 Patent Claims Ineligible

Realtime's claims have always been exceptionally weak, but the weakness of its claims became abundantly clear before Realtime demanded that the Court lift the stay, in spite of the pending reexamination and substantial new question of patentability declared by the Patent Office.  The law requires that a plaintiff ***reevaluate its case at all stages*** to avoid needless waste of resources.  *See Highmark*, 572 U.S. at 561; *see also Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, No. 4:03-CV-1384, 2015 WL 6777377, at *2 (N.D. Tex. June 23, 2015) (reaffirming on

5

remand that a case was exceptional in part because the losing party "maintained its infringement claims well after such claims had been shown by its own experts to be without merit and for the express purpose of maintaining leverage"). In particular, a plaintiff must withdraw its case when arguments as to the asserted patent's eligibility are "especially weak" based on decisions finding related patents ineligible. *Ameranth, Inc. v. Domino's Pizza, Inc.*, No. 12CV0733, 2021 WL 409725, at *4 (S.D. Cal. Feb. 5, 2021), *reconsideration denied*, 2021 WL 1853553 (S.D. Cal. May 10, 2021). If the plaintiff fails to do so, as Realtime did here, the case is exceptional.

In *Ameranth*, the Court agreed that the plaintiff's "litigation position on the validity of the [asserted] [p]atent was especially weak after" related patents were held invalid for claiming ineligible subject matter. 2021 WL 409725, at *4 (discussing *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1245 (Fed. Cir. 2016)). The court reasoned that after the determination invalidating the related patents under § 101, "no reasonable patent litigant would have believed the claims in the related patent were viable." *Id*. at *6. The *Ameranth* court cited with favor a different court's exceptional case finding on similar facts involving an earlier patent ineligibility ruling on a related patent. *See Kindred Studio Illustration & Design, LLC v. Elec. Commc'n Tech., LLC*, No. 2:18-CV-07661, 2019 WL 3064112, at *9 (C.D. Cal. May 23, 2019).

As in *Ameranth* and *Kindred*, Realtime's litigation position on the validity of the '610 patent was especially weak at the time that Realtime urged the Court to lift the stay in this case. Two separate courts determined that certain claims of Realtime's related '535 patent were ineligible (and, as discussed in the next subsection, the Federal Circuit found nearly identical technology to be unpatentable). Yet Realtime never properly reevaluated its '610 patent claims in light of these holdings. If it had, it would have determined it could not reasonably argue that the

6

asserted '610 patent claims covered patent eligible subject matter.

Instead of taking a careful look at the validity of the '610 patent, when Defendants' § 285 letter first raised these (and the Federal Circuit's) ineligibility findings with Realtime, it responded with misdirection (largely repeated in opposition to Defendants' summary judgment motion).

***First***, Realtime asserted that this Court ruled at the motion to dismiss stage that the '610 patent covered patent eligible subject matter. Ex. 4 at 1. However, as Realtime knew, the Court merely deferred eligibility consideration until after claim construction, at Realtime's urging. *See* Ex. 5 (Mar. 7, 2018 Hrg. Tr.) at 14:12-15 ("The Court at this point very early in the case is satisfied with the merits of Judge Schroeder's view, and that is we need to get these terms defined and then see where we are."). And when it came, the claim construction decision did nothing to save Realtime's claims. "[A]n infringement lawsuit which was substantively weak when it was filed can become exceptional when claim construction renders the claims therein baseless." *Innovation Scis., LLC v. Amazon.com, Inc.*, No. 1:16-CV-00861, 2020 WL 4934272, at *2 (E.D. Va. Feb. 18, 2020), *aff'd*, 842 F. App'x 555 (Fed. Cir. 2021). The court in *Innovation* explained: "the *Markman* order notified Innovation that the [patent-in-suit] was legally insufficient" because claim construction "caused the patent to claim a result without claiming either 'any new or improved technology for achieving the result' and without explaining 'how' the result is accomplished." *Id.* Here, as in *Innovation*, claim construction confirmed Realtime's claims were "baseless" and continued litigation was "unreasonable." *See id.*; *see also* Dkt. 151 at 2. Specifically, the claim construction order simply confirmed Defendants' position that the '610 patent is directed to the abstract idea of selecting a compression method. *See* Dkt. 151 at 2. In essence, the claim construction process that Realtime so fervently urged as a basis for denying Defendants' motion

7

to dismiss for lack of patent eligibility resulted in no change to the eligibility status of the asserted claims. Likewise, this Court found in the summary judgment order that "[m]ost importantly, neither the claim nor the reference to the [construed] term "throughput of the communication channel" in the Specification explains how the system tracks the number of pending transmission requests to determine throughput of the communication channel." Dkt. 305 at 11.

***Second***, Realtime argued that the *Google* court's holding "strongly supports the validity of the '610 patent." Ex. 4 at 5. However, as the Court explained, Realtime's attempt to rely on "throughput of a communication channel" in the '610 patent was a distinction without a difference and Realtime's argument that "the '610 patent's claims are more like the claims in Realtime's '046 and '477 patents and claims 1-14 of the '535 patent that were not dismissed" was nothing more than a "conclusory statement." Dkt. 305 at 11, 12.

***Third***, Realtime did not even bother distinguishing *Netflix* when it responded to Defendants' letter. As the Court noted in its order, Realtime's attempt to discredit *Netflix* as incorrect was based on "a conclusory statement that lacks explanation." Dkt. 305 at 12.

In sum, Realtime's failure to reasonably reevaluate its case in light of *Google* and *Netflix* renders this case exceptional.

### 2. Realtime's Arguments Were Untenable In Light of the Federal Circuit's *Adaptive Streaming* Opinion and Similar Cases Holding Encoding and Compression Claims Ineligible

There is more. In addition to analyzing decisions impacting ***related patents***, plaintiffs must also assess the law as to ***unrelated but analogous claims*** to determine whether it can reasonably maintain its patent eligibility arguments. *See My Health, Inc. v. ALR Techs., Inc.*, 2017 WL 6512221, at *4 (E.D. Tex. Dec. 19, 2017). For example, in *My Health, Inc.*, the court found a case

exceptional where claims similar to those asserted here "ha[d] universally been found to be unpatentable under *Alice*." *Id*.  The court explained that "[b]y the time [the plaintiff] filed its 2016 lawsuits, guidance from the Federal Circuit regarding claims in this category had mounted to a level that would give any litigant a reasonably clear view of § 101's boundaries." *Id*.

As in *My Health*, after the stay was lifted, Realtime faced "numerous cases invalidating claims directed to" data encoding and compression, including the Federal Circuit's *Adaptive Streaming* opinion, which should have led Realtime to withdraw its case.  Defendants' letter to Realtime put it on notice of *Adaptive Streaming*.  *See* Dkt. 234 at 8–9.  *Adaptive Streaming* **collects** case law holding that data encoding and compression are ineligible for patenting as abstract ideas. *Id.*  In response, Realtime deflected, arguing that *Adaptive Streaming* was irrelevant because it was a "wholly unrelated case" and did not involve "patents/claims conceived by the Realtime inventors."  Ex. 4 at 6; *see also* Dkt. 267 at 12.

Turning back to *My Health*, that court further noted that "numerous cases invalidating claims directed to information collection and analysis, such as the [asserted] patent claims, stood in stark contrast to" cases like *Enfish, LLC v. Microsoft Corporation*, 822 F.3d 1327 (Fed. Cir. 2016), which found a "'specific improvement to the way computers operate' patent-eligible." *Id*. Again, like in *My Health*, the law Realtime faced clearly delineated ineligible claims directed to encoding and compression—like the '610 patent—from computer-improvement claims allowed under *Enfish*.  Thus, Realtime could not reasonably distinguish the '610 patent claims.

Realtime's attempts to avoid *Adaptive Streaming* because it was non-precedential cannot save it from exceptionality.  Dkt. 305 at 6.  As the Court noted, *Adaptive Streaming* is persuasive authority and Realtime pointed to no reason why it could not inform an eligibility analysis,

especially since it relies upon prior decisions holding encoding and compression claims ineligible. *Id; see also My Health*, No. 216CV535, 2017 WL 6512221, at *4 (E.D. Tex. Dec. 19, 2017) (citing *SmartGene, Inc. v. Adv. Biological Labs.*, 555 Fed. Appx. 950 (Fed. Cir. 2014) ("[a]lthough *SmartGene* was an unpublished opinion, it was representative of numerous precedential opinions. . . ."). As the *My Health* court held for the Federal Circuit's non-precedential *SmartGene* opinion, the fact that *Adaptive Streaming* is non-precedential cannot avoid an exceptionality finding.

In sum, this case is exceptional because when the stay was lifted there was "no uncertainty or difficulty in applying the principles set out in *Alice* to reach the conclusion that the ['610] patent's claims are ineligible." *Inventor Holdings*, 876 F.3d at 1379.

### B. The Need for Deterrence Is High

A grant of fees here is also necessary "to advance considerations of . . . deterrence." *Octane Fitness*, 572 U.S. at 554, n.6; *see also Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 647 (2015) (section 285 "safeguards" against litigants that "use patents as a sword to go after defendants for money, even when their claims are frivolous.").

#### 1. There Is a Need to Deter Realtime from Pursuing Wasteful Litigation

An exceptional case finding will deter Realtime from pursuing baseless claims in future cases. Realtime is a serial litigant. A search of Realtime Adaptive Streaming L.L.C. and its affiliate Realtime Data L.L.C. reveals 145 dockets identifying them as plaintiffs. Ex. 6. In addition, Realtime is a sophisticated, patent-attorney-run litigant that routinely works in concert with the Russ August & Kabat firm to monetize patents. For example, attorney Gerald Padian runs Realtime as well as other similar patent assertion entities. *See* Ex. 7 (press release regarding Solas OLED patent assertion entity); *see also* Ex. 8 (Padian LinkedIn Profile). Thus, Realtime

cannot excuse its egregious behavior in this case by feigning ignorance of the law.

The core of Realtime's business model is licensing patents. Realtime brings litigation in federal courts (typically without pre-suit licensing discussions), and attempts to extract settlements through the risk of exorbitant damages awards. In this case, it sought $42 million dollars in damages (including damages periods when the Accused Products were unquestionably licensed). It also leveraged litigation costs imposed upon the Defendants to incentivize taking a license to the '610 patent. Realtime did so by making this litigation as complex and expensive as possible.

Setting aside the fact that the wrong Realtime entity (Realtime Data) first sued the Defendants in Texas with patents it did not own, one way Realtime complicated this case was by refusing to disclose its legal theories or purposefully hiding them under mountains of contentions and expert reports. Realtime did so to increase the time necessary to respond—a tactic that was undoubtedly successful. Realtime also refused to disclose its damages case, including fundamental information required by Rule 26, such as "a computation of each category of damages" claimed by Realtime. Ex. 9 (Feb. 26, 2021 Hrg. Tr.) at 25:1-28:1; *see also* Fed. R. Civ. P. 26(a)(1)(A)(iii). Realtime's behavior forced Defendants to raise the issue with the Court, which ruled that Realtime violated its discovery obligations and had to disclose its damages case that day. *Id*. at 27:15-25.

Similarly, Realtime refused to narrow its case and maintained its twelve infringement claims for the duration despite assurances to this Court that it would reduce its claims. Ex. 10 (July 16, 2021 Hrg. Tr.) at 18:12-21 ("I'm going to take your word for it that you will be responding promptly and fully to [Defendants'] invitation to try to reduce these claims"). The closest it came to reducing claims was an email to the Court on July 30, 2021 with excuses and suggestions that it *might* later identify claims for trial. Ex. 11 ("Realtime has been discussing this latest proposal

internally and expects to respond today."). Still, it never identified the subset of claims it would pursue at trial, forcing Defendants to prepare for trial against every claim raised in the case.

A third way Realtime drove up costs to incentivize taking a license over defending from the claims on the merits was by serving over 600 pages of infringement claim charts and refusing to explain whether its case was based on direct infringement or one of various indirect liability theories. Indeed, even at the trial preparation conference, Realtime could not commit. *Id*. at 29:13-30 ("You're going to have to figure out how you think they really did infringe. Was it direct infringement? Was it equivalence? Was it something else?"). In fact, despite representing to the Court its contentions were complete, Realtime waited until its 431-page infringement expert report to disclose two additional infringement theories. Here again, Realtime forced Defendants to spend significant sums to defend against the late-disclosed infringement theories with additional deposition time, further rebuttal expert opinions, and significant legal vetting—efforts culminating in a motion to strike. Dkt. 242 at 1-4 (moving to strike Dr. Mitzenmacher's previously-undisclosed infringement theories and quoting the February 26, 2021 hearing).

A fourth way Realtime drove up costs was by claiming damages for time when EchoStar, then a DISH vendor, owned the accused functionality. Dkt. 240 at 11-13. EchoStar took a license in 2019, yet Realtime still demanded damages—from DISH—for EchoStar's period of ownership. *Id.* Realtime sought to use the anvil of an overly-inflated $42 million damages claim to pressure Defendants into taking a license. Realtime's tactics imposed significant unnecessary costs on Defendants to prepare its license and exhaustion defense theories for the bench trial.

In fact, this litigation is not the first time Realtime's conduct has merited attorneys' fees. On November 23, 2020—shortly before this Court lifted the stay—the Central District of

California held that Realtime's conduct in the *Netflix* litigation was exceptional and shifted fees to Realtime. *RAS v. Netflix, Inc.*, No. CV 19-6359, 2020 WL 7889048, *6 (C.D. Cal. Nov. 23, 2020) ("Whether Realtime knew or should have known that its claims were baseless . . . is . . . one which this Court would be inclined to find tips over into the baseless range.").

### 2. Plaintiffs Should be Deterred from Asserting Ineligible Patent Claims

The need for deterrence is particularly applicable here, as fees would deter Realtime and future litigants from abusing the judicial system by improperly assuming that § 101 is so undefined or malleable that they can disregard strongly adverse case law and pursue meritless claims. Other courts recognize the need for deterrence where a plaintiff asserts claims that are clearly ineligible under § 101. For example, in *Inventor Holdings*, the Federal Circuit concluded that a district court "acted within the scope of its discretion in finding [the] case to be exceptional based on the weakness of [plaintiff's] § 101 arguments ***and the need to deter similarly weak arguments in the future.***" *Inventor Holdings*, 876 F.3d at 1377 (emphasis added). The Federal Circuit rejected the plaintiff's excuse that "as a general matter that it was and is sometimes difficult to analyze patent eligibility under the [Supreme Court's] framework" because "there [was] no uncertainty or difficulty in applying the principles set out in *Alice*" to the claims at issue. *Id.* at 1379.

Here, like in *Inventor Holdings*, "there [was] no uncertainty or difficulty in applying the principals set out in *Alice*," especially given the *Google*, *Netflix*, and *Adaptive Streaming* decisions. *Id*. An exceptional case finding would signal defendants to stand on their rights when facing meritless claims. *Cf. Kirtsaeng v. John Wiley & Sons*, 136 S. Ct. 1979, 1986 (2016) ("When a litigant . . . is clearly correct, the likelihood that he will recover fees from the opposing (i.e., unreasonable) party gives him an incentive to litigate the case . . . ."). And like in *eDekka*, an

exceptionality finding would encourage plaintiffs with litigation-based business models—like Realtime's—to avoid advancing "insupportable arguments on behalf of an obviously weak patent," while encouraging those plaintiffs to "engage[] in a reasonable and thorough . . . investigation regarding the § 101 standard and relevant authority" before and during a lawsuit. *eDekka LLC v. 3balls.com, Inc.*, 2015 WL 9225038, at *2-4 (E.D. Tex. Dec. 17, 2015). Realtime cannot avail itself of the courts while eschewing its obligation to assess the viability of its claims.

### C. The Defendants' Attorneys' Fees Are Reasonable, Particularly in View of the Unreasonable Way in Which Realtime Litigated Its Claims

Defendants reasonably and necessarily incurred the requested $5,075,519 in attorneys' fees defending the case after the stay was lifted. Upon restarting, Defendants conducted effectively the entirety of fact discovery, including document review and drafting and responding to discovery requests. As detailed above, Realtime ensured that this was a time-consuming process by serving voluminous infringement claim charts and a 431-page opening infringement expert report. Defendants also defended eight depositions noticed by Realtime. In addition, Defendants completed expert discovery, including depositions. Moreover, Realtime sought damages of $42 million, despite the weakness of its case, including time periods for which it was not entitled to damages based on failure to mark, and a clear-cut license defense. *See* Dkt. 240 at 11-15.

Defendants pursued summary judgment, including their successful summary judgment motion regarding subject matter ineligibility. While summary judgment was pending, Defendants were required to prepare for trial for all twelve asserted claims, since Realtime failed to identify its narrower subset of claims for trial. Defendants also incurred fees to file and defend pretrial motions, prepare trial documents, draft outlines, prepare witnesses, and conduct a mock trial. Further, Defendants were required to prepare for a bench trial on the license issues detailed above.

Finally, the Defendants only seek to shift fees incurred after the stay was lifted. Given the circumstances of this case, Defendants' attorneys' fees have been reasonable.

## V. CONCLUSION

For the reasons stated, Defendants respectfully request that the Court declare this case exceptional and award Defendants their attorneys' fees. While the fees incurred through July 2021 are enumerated with this motion, additional fees are being incurred to prepare this motion and a likely reply. Should the Court find it helpful, Defendants respectfully request a hearing and would provide the Court with an updated accounting of fees incurred at that hearing.

Respectfully submitted,                                                                                        Dated: August 13, 2021

*s/ Adam R. Shartzer*          FISH & RICHARDSON P.C.           Attorneys for Defendants DISH
Ruffin B. Cordell                   1000 Maine Ave. SW, Ste. 1000    Network L.L.C., Sling TV L.L.C.,
Adam R. Shartzer                Washington, DC 20024                  Sling Media L.L.C., and DISH
Brian J. Livedalen                PH: 202-783-5070                           Technologies L.L.C.

Hugh Q. Gottschalk            Wheeler Trigg O'Donnell LLP
                                              370 Seventeenth Street, Suite 4500
                                              Denver, CO 80202

**CERTIFICATE OF COMPLIANCE:** This motion/brief complies with: (1) the guidelines set forth in D.C.COLO.LCivR 54.3 and (2) the type-volume limitation of D.C.COLO.LPtR 17. This brief contains 4,549 words.

**CERTIFICATE OF SERVICE:** I certify that on this 13th day of August, 2021, I electronically filed this with the Clerk of the Court using CM/ECF, which will serve all counsel.

**CERTIFICATE OF CONFERENCE**: I certify that on August 12, 2021, counsel for the parties met and conferred regarding this motion and no agreement was reached on exceptionality.

*s/ Adam R. Shartzer*

15